WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cornele A. Overstreet, | No. CV-14-08017-PCT-GMS |
| Petitioner, | **ORDER FOR TEMPORARY RELIEF PURSUANT TO NLRA § 10(j)** |
| v. | |
| Amphenol Griffith Enterprises LLC, | |
| Respondent. | |

Pending before the Court is Petitioner's Petition for Temporary Injunction (Doc. 1). Cornele Overstreet, the Regional Director of the National Labor Relations Board ("NLRB"), seeks a temporary injunction pursuant to § 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j), pending disposition of a labor relations matter before the NLRB. For the following reasons the Director's temporary injunction is granted as to the reinstatement of the terminated employee, but denied as to the remaining relief requested.

## BACKGROUND

Amphenol Griffith manufactures electrical support systems for aviation and aerospace customers at its small plant in Cottonwood, Arizona, with approximately sixty-three non-supervisory employees. Paul Valenzuela was an employee at Amphenol Griffith who decided to reach out to the International Brotherhood of Electrical Workers ("IBEW") over concerns he and other workers shared about their employment.

On July 30, 2013, Valenzuela held a meeting at his home with other employees and a representative from IBEW. (Doc. 1-3 at 15.) Somewhere between sixteen and thirty workers from Amphenol Griffith attended this first meeting. (Doc. 1-3 at 15, 30.)  The IBEW representative spoke, answered questions, and distributed about thirty union representation cards. Eleven employees completed the cards and the employees chose five of their members to form an organizing committee with Valenzuela as their leader.

Over the next month, the employees began to solicit their fellow employees to support the union, but Amphenol Griffith quickly learned of their efforts and launched its own efforts in opposition. Five or six employees attended the next union meeting a week later on August 6. (Doc. 1-3 at 15, 30.) They submitted three additional signed union cards at this meeting. (*Id.* at 31.) They began handing out union authorization cards and some of the other employees they gave the cards to decided to give the cards to management and report the activity. On August 7, Amphenol Griffith held its first meeting at work to express its opposition to the idea of a union. The human resources manager held up one of the union authorization cards in front of all the employees and generally tried to discourage the employees from signing one.

Two days later the production supervisor Linda Mazas held a series of small group meetings with employees. She gave them a flyer opposing the union and again expressed the Company's opposition. Mazas had a list of the employees' attendance points and talked with them about how the Company was not very stringent in its current policies regarding attendance or drug testing. She talked about how that could change and implied that it might as a result of collective bargaining. Mazas talked to some employees about their attendance points and the employees contested the numbers she gave them. Some employees allege that she said or implied they could lose their jobs if they signed the union cards, but Mazas denied that allegation.

The next union meeting was held on August 13 with four employees in attendance and two signed cards submitted. On August 15, the Company included a flyer entitled "The Top Ten Reasons to Vote NO for a Union" in the envelopes with all the employees'

paychecks. Valenzuela prepared a response flyer entitled "Ten Answers to Ten Lies," which he handed out in the parking lot on August 16 before work. In addition to other issues, the flyer referred to whether Mazas said that employees could lose their jobs if they signed a union card and also challenged the Company's assertion that it had an open-door policy. At the end of work that day, Amphenol Griffith called another meeting in which the General Manager Kelly Osborne stood in front of Valenzuela's desk. Osborne said that Mazas did not tell anyone they would lose their jobs if they signed a card. He also said he did have an open door policy and he challenged anyone who felt differently to speak up. While he said this, Osborne may have looked at Valenzuela and other members of the union organizing committee.

Valenzuela created another flyer entitled "The Union's Top Ten Reasons for Voting 'Yes'" and distributed it before work on August 21. On August 26, a Human Resources Director for the Company, Mimi Morgan, came to the facility to meet with employees. She met with groups of about ten employees at a time and again communicated the Company's opposition to the union. She also talked about employee concerns including raises and how the Company determines them. She said that a decision about raises had been made months ago but that because of the union effort she could not tell the employees about it because the Company did not want to be accused of trying to bribe the workers with a raise or punish them by denying one.

There were additional union meeting held on August 20, 27, and September 3, each attended by about five people. During this time tensions began to build between employees in favor of the union and those opposed to it. Some of the employees felt they were being unfairly blamed for defects or mistakes in the products by employees on the other side of the debate over unionization. On August 27, some employees alleged that Valenzuela used profanity in reference to another employee and her brother, Josh Schimikowsky. Management investigated this, gathered signed statements, and believed it occurred even though Valenzuela denied it.

On August 28, one of the employees in the union organizing committee, Jennifer

Perry, went to talk to Josh Schimikowsky. Perry said that Valenzuela wanted to meet with Schimikowsky after work at a location away from work in order to work out their problems with each other. Josh Schimikowsky did not want to meet and no meeting occurred. This event was reported to management, with the employees describing it as a threat or invitation to fight. Again management investigated and gathered signed statements.

The conversation occurred on August 28 but management did not call Perry in and question her until a week later on September 4. Although management was aware of the union organizing effort and knew which employees were involved, September 4 was the first day that Valenzuela saw a member of management come out into the parking lot before work and see him distributing flyers. That day was also the first day that Valenzuela and others began wearing yellow wristbands at work, openly indicating their support for the union.

During its investigation, management determined that the request to meet was not a threat. After Valenzuela denied asking Perry to arrange a meeting, management called Perry in again and told her that she had to give a signed statement even though she had earlier declined to do so. In her statement she indicated that she had been asked to arrange the meeting. Perry later recanted that statement and told the NLRB that she was under duress and only wrote what she felt management wanted because she worried about her job and the job of her mother who also worked there. Management decided that she was telling the truth and that Valenzuela was lying when he said he did not ask Perry to talk to Josh Schimikowsky and arrange a meeting.

On September 5, Amphenol Griffith fired Valenzuela because his "statements during a Company investigation were determined to be untruthful and an attempt to obstruct the investigation." (Doc. 1-3 at 73.) The next day, the IBEW submitted a complaint to the NLRB against Amphenol Griffith over Valenzuela's termination. (*Id.* at 1.) The Director issued a Complaint and Notice of Hearing ("Complaint") against the Amphenol Griffith on November 29, 2013. (*Id.* at 3–8.) The hearing on the Complaint

before an administrative law judge of the NLRB is scheduled for February 25, 2013. (*Id.*) The Director filed a Petition seeking a temporary injunction under § 10(j) of the NLRA on January 31, 2014. (Doc. 1.) The matter is now fully briefed (Docs. 14, 23, 25) and this Court held a hearing on the matter on February 20, 2014.

Two months after the Company fired Valenzuela, another union organizing committee member, Devin McBryde, asked a coworker how the coworker was doing. (Doc. 1-3 at 54–56.) McBryde alleges that the employee responded with profanity-filled comment about how the coworker will be doing better after McBryde and the union supporters get out. (*Id.*) There were also statements against the union being written in the break room with knowledge of the management. (*Id.*) McBryde reported this to management at the Company because he felt harassed and the Human Resources Manager from Amphenol Griffith reportedly told him that "employees were entitled to their own opinion" and that McBryde should "meet [the employee] after work to resolve [their] differences." (*Id.*) McBryde noted to himself the similarity between that suggestion and what got Valenzuela fired. (*Id.*) McBryde also indicated that support for the union has diminished since Valenzuela was fired, with employees indicating that they do not want to be involved because they do not want to be fired or lose their Christmas bonus. (*Id.*)

## DISCUSSION

### I.      Section 10(j) Injunctive Relief

The administrative process by which the National Labor Relations Board ("NLRB") addresses unfair labor practices can be slow. *Frankl v. HTH Corp.*, 650 F.3d 1334, 1340 (9th Cir. 2011). Its General Counsel issues a complaint and commences proceedings before the NLRB, which then issues an order that is followed by an enforcing decree from the circuit court of appeals. *Id.* This process can take years, and by then it may no longer be possible or feasible for the NLRB to restore the status quo. *Id.*

Congress addressed this problem by adding § 10(j) to the National Labor Relation Act. *See* Labor–Management Relations Act, 1947 (the "Taft–Hartley Act"), Pub.L. No.

80–101, § 101, 61 Stat. 136, 149, *codified at* 29 U.S.C. § 160(j). Section 10(j) gives the NLRB the power, upon issuance of a complaint, to petition the district courts "for appropriate temporary relief or restraining order." *Id.*

The statute gives a district court jurisdiction to grant the relief "it deems just and proper," *id.*, and in making that determination "courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010). Specifically, the Regional Director seeking § 10(j) relief "must establish that (1) he is likely to succeed on the merits, that (2) he is likely to suffer irreparable harm in the absence of preliminary relief, that (3) the balance of equities tips in his favor, and that (4) an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (numbering added). The Ninth Circuit continues to analyze these four elements using a "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The element of irreparable injury, however, is not subject to balance; the moving party must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.

The Court will first evaluate the individual strength of each element and then determine whether they are collectively sufficient under the sliding scale approach.

**1.      Likelihood of Success on the Merits**

The first element in the *Winter* test is whether the Director is likely to succeed on the merits. "[L]ikelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [the circuit court] would grant a petition enforcing that order . . . ." *Frankl*, 650 F.3d at 1355.

Section 7 of the NRLA guarantees employees a variety of rights and protections in relation to labor union activities. 29 U.S.C. § 157. Here, the Complaint against Amphenol Griffith alleges multiple unfair labor practices in violation of the NLRA including

violations of sections 8(a)(1) and 8(a)(3). Under those sections

> It shall be an unfair labor practice for an employer--
>
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7 of the NLRA];
>
> . . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization . . . .

29 U.S.C. § 158.

For the reasons discussed below the Court finds that there is a high likelihood that the NLRB will find that the discharge of Valenzuela was in violation of the NLRA and that the Ninth Circuit Court of Appeals would grant a petition enforcing that order. As to the remaining allegations that Amphenol Griffith's conduct violated the NLRA, the Court finds that the Director has not sufficiently established that it is likely to succeed based on the evidence before the Court at this time.

### A.     Discharge of Paul Valenzuela

The primary alleged violation is the discharge of Valenzuela. The Director alleges that the firing was motivated by Valenzuela's union activities, which would be in violation of § 8(a)(1) and § 8(a)(3) because it would be a discrimination of his tenure of employment in order to discourage membership in a labor organization. The Company alleges that Valenzuela was discharged for the permissible reason that he lied during an investigation.

In cases where an employer might have dual motivations for its actions, the NLRB applies a burden-shifting analysis. *Wright Line, A Div. of Wright Line, Inc.*, 251 NLRB 1083, 1087 (1980) (interpreting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). The *Wright Line* analysis has been upheld by the Supreme Court and applied in the Ninth Circuit Court of Appeals. *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 399–403 (1983), *overruled on other grounds by Office of Workers' Comp. Programs v. Greenwich Collieries*, 512 U.S. 267, 276–78 (1994); *Healthcare Emps. Union v.*

1   *N.L.R.B.*, 463 F.3d 909, 919 (9th Cir. 2006).

2   Under the *Wright Line* test, the board requires that

3   the General Counsel make a prima facie showing sufficient to
4   support the inference that protected conduct was a
    'motivating factor' in the employer's decision. Once this is
5   established, the burden will shift to the employer to
    demonstrate that the same action would have taken place even
6   in the absence of protected conduct.

7   251 N.L.R.B. at 1089. The Director can meet the burden of showing that the protected

8   conduct was a motivating factor in a number of ways.

9   "Motive is a question of fact, and the NLRB may rely on both
    direct and circumstantial evidence to establish an employer's
10  motive, considering such factors as the employer's
    knowledge of the employee's union activities, the employer's
11  hostility toward the union, and the timing of the employer's
    action." *Power, Inc. v. NLRB*, 40 F.3d 409, 418 (D.C. Cir.
12  1994); *see also E.C. Waste, Inc. v. NLRB*, 359 F.3d 36, 42
13  (1st Cir. 2004) ("To determine motive, the Board may rely on
    indirect evidence and inferences reasonably drawn from the
14  totality of the circumstances.").
15

16  *Healthcare Emps. Union*, 463 F.3d at 919.

17  Here, the Director has established a prima facie case that Valenzuela's union

18  activity was a motivating factor in the Company's decision to fire him. Considering the

19  factors for determining motive, it is undisputed that Amphenol Griffith had knowledge of

20  Valenzuela's union activities and that it exhibited hostility towards the union or at least

21  strong opposition to it. The timing of its action also supports this conclusion. The

22  Company fired Valenzuela within a month of learning about the union activities and on

23  the day after he and other union supporters began openly supporting the union during

24  working hours by wearing bright yellow bracelets. Although the Company took some

25  issue with the characterization that it had "animus" against the union, at oral argument

26  the Company did not seriously dispute that the Director had established a prima facie

27  case and instead argued that it would have made the decision even in the absence of the

28  impermissible motivation.

- 8 -

1    Accordingly, under the *Wright Line* test the burden shifts to the Company to show

2    that it would have taken the same action even without the impermissible motivation. In

3    other words, the dispositive issue is whether Amphenol Griffith would have fired

4    Valenzuela based solely on its determination that he lied or obstructed its investigation.

5    More precisely, this Court must determine whether the Director is likely to prevail in the

6    face of this affirmative defense by the Company.

7        Although lying can provide a valid reason to fire an employee, whether a

8    Company would fire an employee over a particular lie necessarily requires considering

9    that lie in context. If an employee lies about whether he performed a task that his

10   supervisor had assigned him, that could easily lead to his termination. However, if he lies

11   about activities that the employee wanted to pursue after work hours, that seems less

12   likely to the Court to result in termination.

13       Amphenol Griffith cites to a case that noted that "[l]ying constitutes a

14   dischargeable offense," but in that case the lie related to work and whether an employee

15   or a supervisor was lying about calling in to get time off. *Mastro v. Potomac Elec. Power

16   Co.*, 447 F.3d 843, 847–49, 854 (D.C. Cir. 2006). Another case that it cites as being

17   "remarkably similar" is also distinguishable for the same reason. *Country Epicure, Inc.*,

18   276 N.L.R.B. 436 (1985). In that case the employee lied about where he was all morning

19   and claimed to be getting parts for his job when he was in fact meeting with another

20   employee about the union.  *Id.* at 436–38. Further, in that case there was "no evidence

21   indicating that Respondent was aware of [the employee's] union activity" or that the fired

22   employee was "was one of the instigators and prime movers of the union movement." *Id.*

23   at 439. Here, Amphenol Griffith was aware of Valenzuela's activities and that he was one

24   of the prime movers in the union effort. Unlike the employee in *Country Epicure*, he did

25   not lie about any part of his job.

26       If Valenzuela lied at all, the lie was about whether he asked someone to ask

27   someone else to meet him outside of work. There is no indication why such a lie would

28   have any bearing on his job performance. The employees claimed it was a threat, but the

1    tensions were running high and the Company determined it was not a threat. The
2    employee did not decide to report it for at least a day, and the Company did not consider
3    the matter urgent enough to require immediate resolution. It waited a week before talking
4    to Perry and another day after that before firing Valenzuela. Here, the lie is not
5    reasonable as an independent basis for firing Valenzuela. The Director is still likely to
6    prevail under the *Wright Line* test even after the Company presents this alternate basis for
7    the firing.[1]

8        Additional support for this conclusion is found in Amphenol Griffith's
9    inconsistent responses to similar situations. They did not fire Valenzuela for lying after
10   the Company decided he really had cursed at other employees earlier that same week.
11   The Company did take a particular interest in every complaint against Valenzuela by
12   collecting written statements about both incidents. This is contrasted with the lack of
13   interest the Company expressed when another union member indicated that he had been
14   cursed at a couple of months later. In that circumstance, management suggested the
15   employees work out their disagreement after work. That is the same thing that Amphenol
16   Griffith claimed to be investigating in this case.

17       The Director has shown that the Complaint will likely succeed before the NLRB
18   and the Ninth Circuit under the *Wright Line* test. The Director meets the prima facie
19   burden of showing that Amphenol Griffith was motivated to fire Valenzuela because of
20   his union activities. Amphenol Griffith does not meet its burden of establishing that it
21   would have fired Valenzuela solely based on the lie, because the lie was immaterial to
22   work and it did not react to other complaints in a similar same way. The temporal
23   proximity between Valenzuela's increasing union activities and his termination, along

---

25   [1] Here, the Court does not reach the good-faith belief argument raised by
     Amphenol Griffith because the Company fails to establish that it would have fired
26   Valenzuela solely on that basis even if the Court assumes that the lie was established. The
     Court also does not reach the unlawful interrogation argument raised by the NLRB at the
27   hearing. The NLRB attested that it was adding such an allegation to its complaint, but
     that issue was not sufficiently briefed before this Court and is unnecessary to granting the
28   relief requested.

1   with the inordinate attention that the Company was placing on any complaints against

2   him, makes it likely that the Director will establish that he was discharged in violation of

3   the NLRA.

4       **B.     Alleged Threats by Mazas**

5       The Director next alleges that Mazas made impermissible threats during the small

6   group meetings that she held with employees. These involved allegations that she told

7   certain employees they would be fired if they signed the union representation cards and

8   that the Company might end up more strictly enforcing its attendance and drug testing

9   policies as a result of any union negotiations.

10      The Director has not established that it is likely to prevail on the threats that

11  employees would lose their job if they signed the union cards. This threat was only

12  allegedly made to some employees and there are inconsistencies in what was allegedly

13  said. Mazas denies making that statement. More importantly, all parties agree that in the

14  meeting on August 16 the General Manager refuted that statement, saying that Mazas

15  would not have said it and had been coached and told not to say such things. This made it

16  clear to all the employees that this was not the Company's position and that no one

17  should have inferred that from anything that Mazas said.

18      The statements about stricter enforcement of attendance policies could have been

19  perceived to be implied threats, but the Director has not met the burden of showing that

20  NLRB is likely to find a violation based on these comments. Again the affidavits are

21  conflicting about what exactly was said and there are plausible ways of reading them that

22  would make the comments permissible. It is troubling that Mazas had the employees

23  attendance points with her and that at least some of those totals appear to have incorrectly

24  shown that the employees were in violation of the policy. When that kind of threatening

25  information was presented at the same time as the Company's position against unions, it

26  probably made some employees perceive it as an implied threat. However, this Court

27  cannot conclude based on the affidavits that the Director is very likely to prove this

28  allegation, only that it is possible.

1

2       **C.      Impression of Surveillance**

3           The next allegation is that the Amphenol Griffith gave its employees the
impression that their union activities were under surveillance. This is based primarily on
the manager holding up a union authorization card and including the card in flyers against
the union when the employees were trying to keep their union organizing activities quiet.
Even though the employees were not open in their activities at first, they were handing
out cards and talking to various employees. In a small employer this will obviously get to
management before long and here there are affidavits showing both that employees
informed management of the organizing efforts and that they gave management the union
authorization cards they received. Unlike the case cited by the Director, here there is an
explanation of why management had the cards and it was not reasonable for the
employees to assume surveillance. *Flamingo Las Vegas Operating Co., LLC & Int'l
Union, Sec., Police & Fire Prof'ls. of Am.*, 359 N.L.R.B. No. 98 (Apr. 25, 2013). At least
one union organizing board member saw this personally. (Doc. 1-3 at 52.) Therefore, the
Director is unlikely to succeed in showing that the employees felt that the only way the
card could have gotten to management was by some form of surveillance.

17      **D.      Discussion of Wage Increases and Unlawfully Solicited Grievances**

18          The Director's final allegation is that Amphenol Griffith unlawfully solicited
grievances by bringing up the possibility of wage increases during the middle of the
union activities. "Under the Act, an employer cannot solicit grievances from employees
during a union organizing campaign with the express or implied suggestion that the
problems will be resolved if the union is turned away." *NLRB v. V & S Schuler Eng'g,
Inc.*, 309 F.3d 362, 370 (6th Cir. 2002). Furthermore, "[a]n employer who has not
previously solicited grievances but begins to do so in the midst of a union campaign
creates a 'compelling inference' that the employer is 'implicitly promising' to correct the
problems." *Id.* at 371 (quoting *Reliance Elec. Co.*, 191 N.L.R.B. 44, 46 (1971), *enf'd*, 457
F.2d 503 (6th Cir. 1972)).

28          Again, while it is possible that the NLRB could reach this conclusion, the Director

has not demonstrated that this allegation is likely to succeed. The various affidavits describe the meeting differently and have conflicting reports of how the raises came up and what exactly was said. For the most part it appears that the Company permissibly indicated that it should not discuss any raise without the risk of making it look like it was trying to bribe the employees into not accepting the union or punish them for pursuing it. The problem is that in explaining this situation, the Company did talk about the raises, or at least the possibility of raises. As with the discussion of attendance points, the timing and circumstances here could reasonably lead the employees to feel they were being threatened. However, the Court cannot determine based on the affidavits and other evidence submitted that the Director is likely to succeed in establishing this.

    **E.**    **Summary**

    The Director alleged that Amphenol Griffith committed a number of unfair labor practices. The Director is likely to succeed in proving that the termination of Valenzuela was impermissible under the act. The Director has failed to sufficiently establish a likelihood of success with respect to the other allegations. In general, it is clear that Amphenol Griffith was actively opposed to the union and taking a variety of steps to communicate its opposition and to convince its employees not to join. Aside from the termination of Valenzuela, the Director has not established that the NLRB is likely to find any of these incidents or comments to be a violation of the NLRA.

**2.**    **Likelihood of Irreparable Harm**

    After the likelihood of success, the next factor to consider under the *Winter* test is whether the Director demonstrates that there is a likelihood of irreparable harm. The element of irreparable injury is not subject to the balancing allowed under the other elements of the *Winter* test and the moving party must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Courts have recognized "permit[ting an] alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm." *Frankl*, 650 F.3d at 1362 (quotations and citations omitted). The court in *Frankl* quoted with approval

language that "the discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process" and that the "fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)" *Id.* at 363 (citations omitted). The court summarized these cases by holding that "a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances." *Id.*

Here, the discharge of Valenzuela occurred during an organizing drive. He was not only an activist but the leader of the union activities. Under *Frankl*, that fact alone is usually enough to establish irreparable harm consistent with the post-*Winter* requirements that irreparable harm may not be implied. Here there are no unusual circumstances which make this firing seem any less threatening to the employees of Amphenol Griffith or less detrimental to their rights under the NLRA. The Director produced an affidavit that employees are afraid to be involved with the union after Valenzuela was fired. (Doc. 1-3 at 54–56.) This shows an actual harm to the other employees' rights in addition to the direct harm to Valenzuela. That same affidavit from McBryde states that within a couple months of the firing was "the last time anyone from management has mentioned the Union." (*Id.* at 55:19–20.)

Amphenol Griffith argues that the Court must find a verifiable causation between the management's activities and a drop in support for the union. It suggests that this level of support is best gauged by meeting attendance. As just shown, *Frankl*, held that firing a union activist during a drive will usually constitute irreparable harm. The Company points out that attendance dropped to five before the Company began to speak out against the union. It is worth noting that the union authorization cards were still coming in at that meeting and only stopped after the following meeting, which was after the Company had begun campaigning against the union. However, because this Court has not determined that the Director is likely to prevail on the alleged infractions during August, it is

1   irrelevant whether the drop or rise in attendance and number of signature cards occurred

2   before or after the Company's campaign began.

3        The only relevant causation question is whether firing Valenzuela is likely to

4   cause irreparable harm. The Company argued that there was no irreparable harm because

5   Valenzuela could still go to the union meetings and was still out there distributing flyers

6   in the morning with union members. This ignores the fact that Valenzuela was no longer

7   acting as an employee. He could no longer show the employees that they had the freedom

8   to pursue their rights under the NLRA because he became a reminder of the danger of

9   doing so. Amphenol Griffith fired the leader of the organizing drive; the employee who

10   reached out to initiate contact with the union, and created and distributed flyers at work.

11   The affidavits show that the employees were scared to be involved after his firing and

12   that the management became comfortable enough in the change of circumstances that it

13   no longer feels the need to speak out against the union. These indications of actual harm

14   are enough to meet the required likelihood of irreparable harm under the *Winter* test.

15   **3.    Balance of Equities**

16        The third factor to consider under the *Winter* test is the balance of the equities.

17   "[I]n considering the balance of hardships, the district court must take into account the

18   probability that declining to issue the injunction will permit the alleged[ ] unfair labor

19   practices to reach fruition and thereby render meaningless the Board's remedial

20   authority." *Miller ex rel. N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir.

21   1994), *abrogated on other grounds by Frankl*, 650 F.3d at 1355.

22        Both the Director and Amphenol Griffith argue that the balance of equities is tied

23   somewhat to the first two elements. Here, there is a burden on Valenzuela to be without

24   his job during the pendency of the NLRB action. There is a burden on the union

25   organizing drive and the related rights of Amphenol Griffith employees who have lost

26   their leader and been intimidated. The openness of the union organizing drive and the

27   Company's response to it seems to have died down since the firing of Valenzuela.

28   Without the return of Valenzuela to work, the support for the union may be entirely

1   extinguished by the Company's action before the NLRB reaches its conclusion.

2          The burden on Amphenol Griffith in granting the injunction is that it has to rehire

3   and pay Valenzuela. However, the Company concedes that it will be liable for back pay if

4   the NLRB eventually reinstates Valenzuela. The Court has determined that the NLRB is

5   likely to do so, and therefore, the possible burden against Amphenol Griffith is unlikely

6   to materialize because the Court would only be ordering it to pay now what the NLRB is

7   likely to order it to pay later. Therefore, the balance of equities tips in favor of the

8   Director, Valenzuela, and the employees.

9   **4.      Public Interest**

10         The final *Winter* test factor is the public interest. "In § 10(j) cases, the public

11  interest is to ensure that an unfair labor practice will not succeed because the Board takes

12  too long to investigate and adjudicate the charge." *Miller*, 19 F.3d at 460. "Ordinarily

13  then, when . . . the Director makes a strong showing of likelihood of success and of

14  likelihood of irreparable harm, the Director will have established that preliminary relief is

15  in the public interest." *Frankl*, 650 F.3d at 1365.

16         Both the Director and Amphenol Griffith argue that the public interest is tied to

17  the first two elements. Here, the public has an interest in employees being able to pursue

18  lawful NLRA related activities without fear of being fired. The public also has an interest

19  in companies not being able to benefit during the lengthy delays that often accompany

20  NLRB complaints when the Director has established a likelihood of success on the merits

21  and of irreparable harm.

22  **5.      Sliding Scale**

23         Under the sliding scale, the Court must consider the strength of each of the

24  elements of the *Winter* test and a weakness in any one factor can be outweighed by

25  strength in the others. *Wild Rockies*, 632 F.3d at 1131. Here, the likelihood of success on

26  the merits is high and the likelihood of irreparable harm has been established. The burden

27  of equities tips in the Director's favor and the public interests are in favor of relief. All of

28  the elements weigh in the Director's favor and the *Winter* test is satisfied.

1          Amphenol Griffith argues that relief the Director's requests should be barred

2    because of the delay in seeking this injunction. The Ninth Circuit has long recognized

3    that "[d]elay by itself is not a determinative factor in whether the grant of interim relief is

4    just and proper," and that any delay "is only significant if the harm has occurred and the

5    parties cannot be returned to the status quo or if the Board's final order is likely to be as

6    effective as an order for interim relief." *McDermott v. Ampersand Pub., LLC*, 593 F.3d

7    950, 965 (9th Cir. 2010) (quoting *Aguayo ex rel. NLRB v. Tomco Carburetor Co.*, 853

8    F.2d 744, 750 (9th Cir. 1988), *overruled on other grounds by Miller*, 19 F.3d 449). The

9    Company notes that Valenzuela can be given his back pay later if he is reinstated. That

10    harm could be as effectively remedied by the NLRB's final order but there is other harm

11    at issue here. Unless the Company has already succeeded in irreparably extinguishing any

12    interest in a union, then interim relief and a return to the status quo are still appropriate

13    despite the delay. Here neither party argues that interest in the union has disappeared

14    entirely, and therefore, the relief obtainable by this order can still be effective.

15          Amphenol Griffith also makes general arguments about the scale of the harm here

16    and references the frequency with which the NLRB seeks Section 10(j) injunctions. The

17    only issue before the Court is whether the Director meets the test for relief in this case

18    and not the frequency with which the Director chooses to pursue this remedy. It is

19    irrelevant if other cases where Section 10(j) relief was sought involve more fully-formed

20    unions in active contract negotiations or involve the firing of more employees.

21    Employees have a right to continue their employment and exercise their rights even if

22    they are only starting out to try to form a union. It is no more irreparable to snuff out a

23    nascent organizing effort, whatever its prospects of success, than to violate the rights of a

24    fully formed union negotiating on behalf of all workers.

25                              **CONCLUSION**

26          Having found that relief is appropriate the Court must determine what relief to

27    grant.

28          The purpose of § 10(j) relief is "to preserve the Board's
remedial power." The task of the Board in devising a final

remedy is "to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice." Very often, the most effective way to protect the Board's ability to recreate such relationships and restore the status quo will be for the court itself to order a return to the status quo.

*Frankl*, 650 F.3d at 1366 (internal quotations and citations omitted).

Here, the Court orders the interim reinstatement of Paul Valenzuela to his same position at Amphenol Griffith with the same conditions of employment he had pending the outcome of the Director's Complaint. This will return the situation to the status quo, which will allow the union organizing campaign to continue to its natural conclusion without interference or intimidation from Company actions. The remaining relief requested by the Director was designed to address the remaining allegations of unfair labor practices in the Complaint. This Court has not found that the Director is likely to prevail on those claims and therefore it will not order the injunctive relief of posting or reading this Court's order or other admonitions. The interim reinstatement of Valenzuela will provide the appropriate indication that his termination will likely be found to be impermissible. If any of the Company's other actions are ultimately determined to be unlawful, then the NLRB will issue appropriate relief at that time.

**IT IS HEREBY ORDERED** that, pending the final disposition of the matters involved pending before the National Labor Relations Board, the Petition for Temporary Injunction (Doc. 1) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that Respondent, its officers, agents, servants, representatives, successors, and assigns, and all persons acting in concert with it or them, pending the final disposition of the matters involved herein pending before the Board, shall take the following affirmative actions:

(a) Within five (5) days of this Order, offer Paul Valenzuela (Valenzuela), in writing, immediate reinstatement to his former job, or if that job no longer exists, to a substantially equivalent position of employment, without prejudice to his seniority and other rights and privileges previously enjoyed;

(b) Within fourteen (14) days of this Order, remove from its files, any and all records of Valenzuela's discharge, and within three (3) days thereafter, notify him in writing that this was done, and that the material removed will not against him in any way;

(c) Within twenty-one (21) days of this Order, file with the Court, and submit a copy to the Regional Director for Region 28 of the Board, a sworn affidavit from a responsible agent of Respondent stating, with specificity, the manner in which Respondent has complied with the terms of the Injunction Order.

**IT IS FURTHER ORDERED** that this case shall remain on the docket of this Court, and upon compliance by Respondent with its obligation undertaken hereto and upon disposition of the matters pending before the Board, Petitioner shall cause this proceeding to be dismissed.

Dated this 25th day of February, 2014.

G. Murray Snow
United States District Judge